United States District Court
In the District of Minnesota

Marcus Dwayne Thompson )
Plaintiff, )
)
v. )
)
United states of America, )
Respondent. )
______________________/

Case No.: **0:26-CV-00661-NEB-EMB**

RECEIVED BY MAIL
AUG 24 2026
CLERK, U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

PETITIONER'S REPLY IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS

**INTRODUCTION**

Marcus Thompson lost twenty-seven days of good conduct time to two fabrications: one dressed up as an observation, the other invented out of whole cloth on appeal. Both stood unchallenged for the same reason- nobody ever told him he had the tools to challenge them.

The first fabrication happened at the hearing. A declarant swore, under oath, that witnesses "positively identified" Thompson- and then described an identification made not from his face, but from the color of his sweatpants. He lost a formal finding that he escaped custody because the officer who wrote that finding called it an "observation," when no one in this record ever claims to have observed him leave the institution at all. He never got the chance to test any of it, because the two forms Respondent now

SCANNED
AUG 24 2026
U.S. DISTRICT COURT MPLS

points to as proof he waived his right to a staff representative and to call witnesses do not tell an inmate what a staff representative does, how to request one, or how to call a witness. A right an inmate is never told how to exercise is not a right he can be said to have waived- and a fabrication no one is equipped to challenge is a fabrication that stands by default.

The second fabrication happened after the hearing, and it is the more serious of the two. Region did not misjudge a close call- it introduced a fact into the administrative record that no source anywhere supports: that Pennsylvania State Police found Thompson hiding in the woods and escorted him back to the scene. Thompson said so, in writing, in his BP-11 to Central Office, and pointed to the very report Region cited, which contains no such statement. Central Office had the correction in hand and did nothing with it for over 150 days. It has done nothing with it since. This is not a factual dispute the Court is being asked to referee. It is a fabricated fact that entered an adjudicative record, was flagged to the one body positioned to fix it, and was left standing anyway- at every level that had the chance to catch it.

This reply's lead legal ground is Wolf v. McDonnell's advisement requirement, not the factual disputes that follow it- because the advisement failure is the one argument the "some evidence" standard cannot absorb, and it is the failure that made both fabrications possible in the first place. Superintendent v. Hill tells a court

not to weigh competing evidence behind a disciplinary finding. It says nothing about a hearing process that never told the inmate what evidence he was entitled to gather, or about an appellate process that received notice of its own fabricated fact and chose silence over correction. None of it requires this Court to resolve a single disputed fact- only to read what Respondent's own documents already say.

What follows documents how a record built to withstand scrutiny instead collapsed under it, at every level of review: an unsupported story about how Thompson was found, introduced once and repeated up the chain without anyone tracing it back to a source; an identification built on clothing dressed up in the language of certainty; and an appeal process that was told, plainly, that its own record contained a fabrication- and did nothing for over 150 days. None of it required deference. It required someone to read the file.

Thompson is not asking this Court to take his word for it. He is asking it to read the government's own.

**PART II- CORRECTION**

Petitioner's own filing cited United States v. Caceres for a proposition it does not support, and the citation itself was wrong: the Petition (Dkt. 1 p. 9) cites "440 U.S. 74, 752-53"; the correct citation

is 440 U.S. 741 (1979), and the case does not hold that an agency employee's violation of a protective regulation is itself a due process violation. It holds close to the opposite- that Caceres could not show the reliance a due process claim would require. Petitioner withdraws reliance on it and does not offer a substitute citation for the same proposition, which remains unsupported as stated.

The error came from a pro se litigant's own research and his misreading of what the case held- not from any defect Respondent identified. Respondent's brief does not flag it either. Petitioner's own subsequent review of his filing's authorities found it, and he brings it to the Court's attention now because a litigant who discovers that something in his own filing is wrong has an obligation to correct it, not an option to.. That obligation does not depend on who else has or has not noticed the error first. Fed. R. Civ. P. 11(b) advisory committee's note to 1993 amendment (a litigant's certification is not measured solely as of the time of filing, but extends to "reaffirming... and advocating positions" after learning they no longer have merit).

PART III- THE RECORD DEGRADED ON ADMINISTRAIVE APPEAL

A. The Administrative Record Rests on Facts the Government's Own Sources Do Not Support

Region's response to Thompson's administrative appeal states that Pennsylvania State Police found Thompson hiding in the woods and

escorted him back to the scene. Dkt. 1-1, Ex. 5. No source in this records says that. Officer Zeher's declaration states that bystanders observed a man exit a crashed vehicle and "flee into the woods and towards the prison"- an observation of the direction someone ran at the outset of the incident, not an account of a search, a discovery, or an escort back. Dkt. 11 ¶10. Officer Weseman's same-day memo places Thompson "AT THE CAMP" and escorted from there to the scene. Dkt. 26-1 p. 8. Officer Turner's memo places him exiting his own housing-unit bathroom. Dkt. 26-1 p. 7. The Pennsylvania State Police report's own narrative describes a trooper dispatched for a suspicious vehicle and an unknown male walking toward FCI McKean- nothing about the woods, a discovery, or an escort. Dkt. 1-1, Ex. 7. Three independent government sources describe how this incident actually unfolded, and none of them contains the story Region told. Region did not embellish an existing account. It introduced one.

That fabrication is not the only place the record does not hold together under its own weight. The government's own descriptions of Thompson's clothing shift from source to source- Officer Weseman's SIS memo and two companion staff memos describe "all camo" and a backpack; Officer Zether's sworn declaration describes gray sweatpants and a green jacket; the Pennsylvania State Police report describes nothing at all. Dkt. 11 ¶10; Dkt. 26-1 pp. 1, 5, 6, 8; Dkt. 1-1, Ex. 7. And the same declaration turns an inference into a stated fact outright: it says the investigating officer

"determined that Thom[p]son was observed to: escape from the Federal SPC," when no source anywhere in this record describes anyone actually observing him leave the institution. Dkt. 11 ¶10. Two different problems, one pattern- at every state of this record, something short of certain got written down as though it were settled.

B. The Appellate Process Had a Duty to Correct That Fabrication, and Did Not

Not

Thompson's appeal to Central Office, filed under 28 C.F.R. §542.18, went unanswered for over 150 days. Dkt. 1-1 ¶¶41, 43-44; Dkt. 1 p. 15; Dkt. 1-1, Exs. 5-6. Respondent's Answer does not engage this timeline. Dkt. 10. Under the regulation's own terms, that silence operates as a constructive denial- it does not operate as review. And Central Officer did not simply fail to act quickly. It had, in Thompson's own BP-11, the specific correction this reply now makes; that the State Police report Region cited for the "hiding in the woods" narrative contains no such statement. Dkt. 1-1, Ex.6. It said nothing for over 150 days. It has said nothing since.

Whatever explains it, the timing has hard to ignore: the account Region introduced on appeal does not merely embellish the record- it supplies exactly what the record's actual evidentiary basis

for departure lacks. The departure finding rests on an eyewitness identification made by clothing and body size, not a face. Dkt. 11 ¶16. "Discovered hiding in the woods and escorted back" is a different kind of fact- the kind that does not depend on anyone getting a good look at anyone. This reply does not ask the Court to find why the account was introduced. It asks only that the Court notice it has no source.

Lewis v. Smith, 855 F.2d 736, 738 (11th Cir. 1988), holds that an appellate reviewing body has an obligation to correct errors apparent on the face of the record before it. Petitioner identifies no Eight Circuit or District of Minnesota authority stating the same proposition, and offers Lewis candidly as persuasive, out-of-circuit authority- not as controlling law this Court has already adopted. But the absence of contrary authority is worth noting as much as the absence of supporting authority: no court in this Circuit has held that a prison's appellate review process owes no duty to correct a fact shown to be false. This case supplies as clean a vehicle as any to hold that it must. Wolff v. McDonnell, 418 U.S. 539, 564-65 (1974), requires a written statement of the evidence relied on and the reasons for a disciplinary action precisely so the decision can be checked afterward and the inmate protected against collateral consequence from a misunderstood record- a purpose that presumes someone, at some point, can act on what that record shows. An appellate tier with no obligation to act on a demonstrated falsehood in that record defeats the purpose

the statement exists to serve. It is also, notably, the same obligation Petitioner observed on his own initiative in Part II above, where the error was his: an unrepresented litigant found and corrected his own mistake the moment it surfaced. Central Office had a fabricated fact identified for it, in writing, by the party it had every reason to disbelieve, and did nothing with it for over 150 days. That asymmetry is what this Court is being asked to weigh. No court in this Circuit has yet had occasion to decide whether an appellate review process must correct a fabrication it was shown, in writing, that it introduced. Correcting it now is not just available to this Court. It is what the record requires.

## PART IV- RESPONDENT'S EVIDENCE DOES NOT ESTABLISH DEPARTURE

### A. The Identification Does Not Hold Up, and Thompsons Had No Way to Test it

Officer Zeher's declaration states plainly: "The SIS investigation determined Thompson was seen outside the immediate environs of the institution, which demonstrates he departed from custody." Dkt. 11 ¶16. Respondent's own SENTRY disciplinary record and the DHO Report's own "Element" analysis say the same thing in nearly the same words. Dkt. 11-3 p. 1; Dkt. 11-7 p. 4. Respondent has told this Court, in three of its own documents, exactly what the departure finding is built on: an eyewitness identification, and nothing else. If that identification does not hold up, the Code 200 finding does not survive it.

The government's own SIS memo describes the identification method as clothing and body size- not a face. Dkt. 11-4 pp. 8-9. The clothing that identification rests on does not even agree with itself. Photo 11, taken at 10:07 a.m., shows a dark or olive jacket over a white tank top. Dkt. 26-1 p. 20. Officer Zeher's declaration describes the camera footage differently- gray sweatpants, a gray sweatshirt, a green jacket, black boots- a description that does not match what Photo 11 actually shows. Dkt. 11 ¶10. And the one piece of physical evidence Respondent does have- footprints- does not prove the prints were Thompson's, whatever the DHO Report claims. The DHO Report states the footprints "matched the boots worn by inmate Thompson." Dkt. 1-1 pp. 17-19. But Respondent's own photo caption describes those same prints as consistent with a "generic" issued boot type- the standard boot every inmate at the institution is issued. Dkt. 11 ¶10; Dkt. 26-1 pp. 14-19, 21-22. A print that matches footwear shared by every inmate at the facility does not identify one of them. It proves only that whoever left it was wearing standard-issue boots which, at this institution, is everyone.

The identification itself was never as solid as Respondent's declaration now makes it sound, and Thompson said so from the start. By his own accounts- sworn, consistent, and never contradicted anywhere in this record- the identifying witness poked his head around the corner of a building, made a face, shrugged, and retreated; his body language read as unsure of what he was even being asked.

Dkt. 1-1 ¶¶7-9. He made that identification from roughly thirty to forty feet away. Dkt. 1-1 ¶¶7-9; Dkt. 18 p.2. It was overcast, with a light snow flurry falling. Dkt. 1-1 ¶8. None of that is disputed anywhere in this record not in the Answer, the Zeher declaration, the DHO Report, or any of the staff memoranda that make up the identification packet; the SIS memo, Taylor's memo, the front desk officer's memo, or Turner's memo. Dkt. 11-4 pp. 5-9. Thompson raised this account of the identification himself, at the hearing and in every filing since; what he never had was any tool beyond his own word to press it with. Respondent had every opportunity to dispute his characterization and never did.

B. Respondent's Own Records Place Thompson Elsewhere at the Critical Moment

Dkt. 31 certifies a CCTV timestamp of 09:29:39.198 placing Thompson inside the institution before the Pennsylvania State Police report's own 09:32 timestamp for the incident, and before the roughly 09:40 call that put anyone on notice at all. Dkt. 31 p. 1; Dkt. 1-1, Ex. 7. Respondent elsewhere argues this same certified timestamp is immaterial- an argument that does not survive the timestamp's own affirmative support for Thompson's account. Officer Turner's memo, independently, places Thompson in his own housing unit at approximately the same time. Dkt. 114 p. 6. And the "early visit" phone call Respondent points to has an innocent explanation: the government's own TRUVIEW visits table show all five of the relevant visitor's visits that day beginning between 12:16 p.m. and 1:12 p.m.- none in the morning. Dkt. 26-1 p. 28. Three different government-

generated records, three independent confirmations that Thompson was not where the departure finding requires him to have been.

C. Thompson Was Not Alone, and He Said So at the Hearing- Neither Face Was Ever Addressed

The CCTV still shows a second person present with Thompson. Thompson's declaration identifies that person as Cornelius Edrington, Reg. No. 04476-061- "the other inmate seen on the camera as we both went into the unit after being at recreation." Dkt. 1-1 ¶¶46-47. Respondent's Answer does not mention Edrington, or any companion, at all. Dkt 10. This is not a witness Thompson simply failed to call- it is the witness he named as one he would have called. "The witness I would have called if I had been afforded a staff representative, or allowed to call a witness, is: Cornelius Edrington." Dkt. 1-1 ¶46. That is a second harm flowing from the same advisement failure addressed below in Part V- not just an unexplained right, but a specific, named witness it cost Thompson the ability to call.

Edrington is not the only defense the DHO had in front of him and did not grapple with. Officer Zeher's own declaration quotes Thompson's hearing statement verbatim: the wardrobe description fit "every inmate"; the identifying witness "made a face like he didn't identify me"; the timeline did not add up- the call to the lobby came at 9:40, and Thompson was seen at 9:29. Dkt. 11 ¶14. The same declaration then states that Thompson "failed

to provide any exculpatory evidence on his behalf." Dkt. 11 16¶. Respondent's own document contains both the defense and the DHO's rejection of it in the same breath- recorded, and then discounted, not absent.

**PART V- THE PROCESS FORECLOSED THE SHOWING**

The due process violation at the center of this case is not one misstep among several- it is the error that started the cascade, the reason none of what follows in this reply was ever actually tested. Thompson was asked whether he wanted a staff representative and whether he wanted to call witnesses. He was never told what either right meant, what a representative could do for him, or how calling a witness would even work. This was Thompson's first and only disciplinary incident in BOP custody. Dkt. 11 ¶8. The form presented both rights as a bare yes-or-no election, with nothing explaining what was actually being offered or given up.

Thompson has said the same thing in three separate filings: he was never given any explanation of his right to a staff representative or to call witnesses. Dkt. 1 p. 8, under 28 C.F.R. §§541.7(g), 541.8(d), (f). Respondent's Answer does not engage what that failure actually cost him. Dkt. 1 p. 8 pled the consequence directly: the advisement failure foreclosed Thompson's ability to challenge the identification, rebut the Incident Report, or produce Cornelius Edrington as a witness- and Respondent's Answer addresses none

of it. Dkt. 10. The same declaration that later faults Thompson for failing to "provide any exculpatory evidence" never asks whether the process gave him any way to produce some. Dkt. 11 ¶16.

A. The Documents Respondent Offers as Proof of Advisement Do Not Prove It

Dkt. 11-5 (Ex. E) states that the signer "has been advised of" seven enumerated rights, but nowhere explains any of them. The right to a staff representative does not say what a representative does, whether one may investigate on the inmate's behalf, or how to request one. The right to call witnesses does not say how or by when to identify them. Dkt. 11-5 P. 1. This is a defect on the face of the document itself. Dkt. 11-6 (Ex. F), the charging and hearing-notice form Respondent relies on for the same purpose, is defective on its own face for a different reason. It's "Date of Offense" field states February 6, 2025- not the actual offense date of December 28, 2024, but the date the Incident Report was delivered, an error of roughly forty days. Dkt. 11-6 p. 1. Its hearing date, time, and location fields are blank, stating only "Next Available Docket Date." Dkt. 11-6 p. 1. Written notice of the charge at least 24 hours before the hearing, waivable only in writing, is precisely what 28 C.F.R. §541.8(c) requires.

The declaration Respondent offers to fill the gap does not fill it. Officer Zeher recites BOP process in the abstract at ¶4 ("it will advise the inmate") and then asserts at ¶12 representative

and declined to call any witnesses," citing Exhibits E and F. Dkt. 11 ¶¶4 and 12. Zeher was not present at that hearing- he served as DHO at s separate hearing on February 25. Dkt. 11 pp. 2, 5-6. He cites documents, not recollection. That is not an argument that Zeher testified falsely; he cited his sources accurately. It is that the sources he cited- two forms marked "(do not)" next to representative and witness elections, with no separate signature or initial accompanying either waiver- do not themselves establish that Thompson was ever told what he was declining. The record does not even agree on when advisement supposedly happened: Zeher's declaration places it on February 6, when the Incident Report was delivered, citing Exhibit D- the Incident Report itself, not a rights form. Dkt. 11 ¶11. But both Exhibit E and Exhibit F are dated February 12, the UDC hearing date. Dkt. 11-5 p. 1; Dkt. 11-6 p.1. No document in this record shows a signed written advisement dated February 6, and no one who was actually present at the February 12 hearing where advisement supposedly happened has said anything about it at all.

Thompson raised his challenges to the identification and the timelines at the DHO hearing itself, not for the first time in this litigation- Officer Zeher's own declaration quotes him doing so. Dkt. 11 ¶14. The DHO nonetheless found he had provided no exculpatory evidence. Dkt. 11 ¶16. That is not a case of an inmate who failed to raise a challenge; it is a case of an inmate who raised what he could and was found wanting for lacking tools no one ever gave him.

He has also named the witness he would have called and described what that witness would have shown, tied directly to the identification challenged above. *See* Part IV. C. *supra*.

B. Formal Compliance on Paper Is Not the Advisement Due Process Requires

*Wolff v. McDonnell* requires advance written notice, a written statement of the evidence and reasons, and the opportunity to call witnesses and present evidence- not because the form of these protections matters for its own sake, but because each exists to give an inmate an actual chance to defend himself before losing earned time. 418 U.S. 539, 563-67 (1974). A regulation guaranteeing the right to a staff representative or to call witnesses does that work only if the inmate is told, in substance, what those rights mean. A checkbox next to "yes" or "no." standing alone, does not do that- it records an election, not an understanding of what was being elected. Nothing on Exhibit E or Exhibit F describes what a staff representative could have done for Thompson or what calling a witness would have required of him. If either form had explained that, this would be a different case.

That is the defect running through every document Respondent relies on here. Respondent's position, in substance, is that checking a box and signing a form satisfies *Wolff* regardless of what the box explained- that formal compliance is enough, whatever actually happened in the room. It is not. An inmate asked a yes-or-no question about a right he has never had described to him is not exercising

that right or waiving it. He is guessing. And that is precisely the harm this reply has already shown flowed from it: a witness Thompson would have named, a distance and a description he would have pressed harder, and a hearing record that shows him raising what he could with nothing but his own word, because his own word was the only tool anyone ever told him he had.

C. No One Has Ever Said the Delay or the Delivery Happened Differently

The Incident Report was not delivered to Thompson until February 6, 2025- roughly forty days after the December 28, 2024 incident it describes- and was, by Thompson's consistent account, pushed through the cell door with no accompanying staff contact. Dkt. 1 p. 13; Dkt. 10 p.3; Dkt. 26-1 p. 2; Dkt. 11-7. Whatever scheduling explanation now account for that gap surfaces for the first time in this litigation; it appears nowhere in the administrative record itself. Nothing in this record contradicts Thompson's account of how that delivery happened. Respondent has not produced video or a still image showing otherwise. It has not produced a declaration from the staff member who actually delivered the Incident Report or conducted the UDC hearing. Every account of what happened on February 6 and February 12 comes from Officer Zeher- who was present for neither. Thompson was present. No one who disputes his account was.

Thompson also asked, during the administrative process, to review the underlying video of him and the other inmate entering the housing unit- not just the single still frame Respondent produced. Dkt. 1-1. Decl. ¶4. That request was **denied**, and nothing in this record shows any footage beyond the single still was ever produced. Petitioner does not ask this Court to weigh footage that is not in the record, and does not move for its production here. The point is narrower: Thompson was never told a staff representative existed who could have sought that footage on his behalf, or told that requesting one might have produced a fuller record than a single image. Production of any additional footage that may exist remains an option available to the Court; it is not relief Petitioner demands.

**PART VI- RESPONDENT'S AUTHORITIES**

A. Respondent's Own Authorities

Respondent's brief cites four cases for the proposition that courts owe near-total deference to prison disciplinary findings. Three of them do not say what Respondent's brief says they say. Respondent and Petitioner share the same obligation under Fed. R. Civ. P. 11(b).

Respondent quotes both Courtney v. Bishop, 409 F.2d 1185, 1187 (8th Cir. 1969), and Mason v. Sargent, 898 F.2d 679, 680 (8th

Cir. 1990), for the proposition that "courts are not part of the appellate process for prison discipline proceedings." That language does not appear at either citation. Courtney's actual text conditions judicial reluctance to intervene on the absence of a constitutional infringement, and states that fundamental rights "follow him through the prison gate" the opposite of a blanket non-interference rule. It is also, independently, a 1969 Eight Amendment case decided five years before Wolff established the due process framework this case turns on- not a disciplinary due-process case at all. Mason supports the "some evidence" standard generally; it does not contain the specific "not part of the appellate process" language attributed to it.

Respondent separately cites Campbell v. Cauthron, 623 F.2d 503, 505 (8th Cir. 1980), for the proposition that "some evidence" supports the DHO's conclusion. Campbell is not a "some evidence" disciplinary-review case at all. It is a pretrial-detainee conditions-of-confinement class action, addressing a different population and a different legal question entirely.

B. Respondent's Own Due Process Framework Case Rules the Other Way

Respondent string-cites Dibble v. Scholl, 506 F.3d 1106, 1110 (8th Cir. 2007), alongside Hill and Wolff for the governing due process framework, and the legal standard Respondent draws from it is accurately stated. What Respondent does not mention is how

the case came out: the Eighth Circuit in Dibble held that the disciplinary notice given to the inmate failed to satisfy due process, and ruled against the institution- the same Circuit, applying the same framework Respondent invokes here, finding that formal notice is not enough when it does not actually inform the inmate of what he faces. That is this Court's role in this case as well: not to defer reflexively to whatever conclusion a disciplinary body reached, but to confirm that the process required by law was the process actually given, in letter and in spirit. Wolff, 418 U.S. at 563.67, sets procedural minimums precisely because a hearing that satisfies the form of a requirement while ignoring its substance is not the hearing due process demands. Respondent's own authority shows this Circuit has already said so once. The record before the Court shows clearly that neither the letter nor the spirit of that requirement was met here.

**PART VII- RELIEF**

The record here does not present a close call. Two fabrications entered a record that was supposed to be built on fact, and neither one has ever been contested- not the story of a police escort back from the woods, not the sworn account of an escape no one ever observed. The Constitution required that Thompson be told what his rights meant before he could be asked to give them up, and he was not. Respondent has had every chance, in this litigation and before it, to dispute any of this. It has not taken it. To

the extent Respondent later attempts to raise disputes it did not raise in its Answer or in this litigation to date regarding the delivery of the Incident Report, the appellate silence documented above, or the prejudice flowing from the advisement failure- those arguments come too late to be considered now. What remains is a disciplinary finding built on an unrebutted fabrication, defended by evidence that does not hold together, entered through a process that never told the man it applied to what he needed to do to defend himself. Thompson respectfully asks this Court to say so.

For the reasons set forth above, Petitioner respectfully requests that the Court:

1. Find this petition properly exhausted and within the Court's jurisdiction;
2. Vacate and expunge Incident Report No. 4062002 and the associated Code 200 finding;
3. Restore the twenty-seven days of good conduct time disallowed as a result of that finding;
4. Direct that any sentence computation dates and scores actually affected by that restoration be recalculated accordingly;
5. Direct that updated records reflecting this relief be issued; and
6. Award Petitioner his costs of this action pursuant to Fed. R. Civ. P. 54(d)(1) and 28 U.S.C. §1920.

RESPECTFULLY SUBMITTED this 18th day of August, 2026.

Marcus D. Thompson
Petitioner, Pro se